**In the Interest of J.R., D.R., W.R., and K.R.**

**No. ED 95833.**

Missouri Court of Appeals, Eastern District, Division One.

Aug. 16, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 15, 2011.

Robert W. Bilbrey, Hillsboro, MO, for appellant.

Abigail W. Sapp, Hillsboro, MO, for respondent.

GARY M. GAERTNER, JR., Judge.

### Introduction

K.A.R. (Father) and J.L.R (Mother) (collectively, Parents) appeal the Judgment and Order of the Circuit Court, Juvenile Division (Juvenile Court) terminating their parental rights to their minor children J.R., D.R., W.R., and K.R. We reverse.

### Background

Parents married in 2008, and are the natural parents of J.R., born on March 27, 2003; D.R, born on November 29, 2004; W.R, born on October 9, 2006; and K.R., born on October 9, 2006. On November 25, 2008, the Department of Social Services, Children's Division (Children's Division) took immediate temporary protective custody of the children following a hotline call concerning an unsanitary home. An inspection revealed that the home was unsafe and unsanitary for the children as follows. Upon entering the home, the caseworker noted a strong odor of urine and feces. The home contained a heap of trash, including dirty diapers, swept into a pile; a litter box filled with cat feces; cat vomit on the floor; a sink full of dirty dishes; and a number of cockroaches and other flying insects. The children were suffering from a variety of health problems, including lice, a staph infection, scabies, and pink eye; and D.R., almost age four, was not fully toilet trained, her speech was not understandable, and she did not appear to comprehend questions.

At a December 3, 2008, hearing on the temporary placement, the Juvenile Court found that probable cause existed for the children to remain in protective custody. Parents signed a Consent Judgment/Order and Finding of Jurisdiction in which they agreed that they had been advised of their right to be represented by an attorney, including by court appointment if they were unable to afford one, but waived counsel; agreed to comply with the terms of a service agreement; and agreed to pay $10 each per month in child support. Before Parents signed the Consent Judgment, the Juvenile Court confirmed that Parents had read and understood the document, and specifically informed them that

they had a right to an attorney and did not have to sign the Consent Judgment.

The Juvenile Court also questioned Parents about how their situation had gotten so bad, and Father replied, "In all honesty, it got like this because [Mother] had some issues that was haunting her from her past and it was basically left up to me to watch the four kids and take care of the house ... but I couldn't get it all done by myself." Mother agreed, stating that she was seeing a counselor and had been diagnosed with severe depression, but that she had been on medication for about three weeks and it was helping. Father stated that he had taken pictures of the house after they cleaned it up, but had not had a chance to show it to the Children's Division yet. The Juvenile Court warned them that they "need[ed] to do the services asked of [them]," that the court would review the case every ninety days and there needed to be "a lot of things done" by then, and that they did not "have forever[:] [t]here's a clock ticking right now, and if these kids aren't ready to go home within a certain time, the law says we've got to make other provisions for them."

Mother's family treatment plan stated, as relevant for this appeal, that she would participate in parenting classes, be available for monthly home visits by their caseworker, pay child support, keep her home safe and sanitary, obtain and maintain employment, participate in individual counseling, continue to see a psychiatrist to monitor her medication, and participate in a psychological evaluation. Father's family treatment plan was substantially similar, but provided that instead of continuing to see a psychiatrist to monitor medication, he would participate in an anger management assessment. It was later determined that the anger management assessment was unnecessary.

Parents attended parenting classes in February 2009, but did not obtain a certificate due to a missed make-up class. The Children's Division noted while Parents remained in their house, they kept it clean. Parents participated in psychological evaluations in April 2009, which recommended weekly counseling for both and additional parenting classes. Parents attended a second parenting class in December 2009.

Mother had been receiving counseling and taking medication for her depression before the children were removed from the home. Three progress reports dated May, June and August, 2009 noted satisfactory progress despite less-than-regular attendance and that Mother was taking her medication. The August report noted that Mother was feeling less depressed. Records included in the legal file show that Father attended seven out of ten scheduled counseling sessions, until services were cancelled for "lack of compliance."

Mother obtained employment in October 2009, which she maintained throughout this case. Father obtained employment at several places, but was not employed at the time of the termination hearing. Parents struggled to maintain housing. They were evicted from their home in August 2009, and moved in with relatives who would not allow Children's Division into their home. Parents moved into a trailer by December 2009, but were again evicted. Following eviction from the trailer, they moved in with Mother's grandparents. Parents largely did not attend scheduled meetings with the Children's Division and did not pay child support.

At a March 10, 2009, review hearing, the Juvenile Court expanded Parents' visitation rights to unlimited supervised visitation, and at a June 30, 2009, review hearing, the Juvenile Court granted Parents unsupervised visitation, including one overnight visit. In October 2009, however, the Children's Division filed a motion to decrease visitation to one hour of supervised visitation a week, because Parents had

been evicted and did not have a proper residence for overnight visits, and because Parents had not been complying with services. At an October 27 hearing, the Juvenile Court reduced Parents' visitation to three supervised hours a week, noted the Children's Division plan to file a petition to terminate parental rights (TPR), and appointed attorneys to represent Mother and Father.

In December 2009, the Children's Division filed a TPR petition, asserting that the children had been under the jurisdiction of the Juvenile Court for over one year, and the conditions that led to the assumption of jurisdiction still persisted and there was little likelihood that they would be remedied, in that Parents were not complying with the terms of their service agreements.

After the Children's Division filed the TPR petition, Parents attended a third parenting class in February 2010. Mother continued seeing a counselor through May 2010, and reported decreasing levels of depression and anxiety. Mother attempted to resume therapy in August, but the record shows that her counselor refused further sessions because the counselor had changed jobs. Although Mother apparently was not seeing a psychiatrist, she reported that her medication continued to be prescribed by a family doctor.

Of the various court hearings, Parents attended the December 3, 2008, hearing where they consented to the Juvenile Court's jurisdiction; the March 10, 2009, dispositional review hearing; the June 30, 2009, dispositional review hearing; and the October 27, 2009, permanency planning hearing. At the December, March, and June hearings, Parents specifically waived counsel. Parents did not appear for the February 9, 2010, post-permanency planning hearing, although their attorneys appeared. Parents attended the June 15, 2010, post-permanency planning hearing.

At the October 2010 hearing on the TPR petition, neither Parent appeared for the hearing, but they were both represented by appointed counsel. Father's attorney requested a continuance, stating that Father was "aware of the trial date" and had "always appeared [for] court." He argued that, because he had "no explanation" for why Father had not appeared, the court should grant a continuance to "give [Father] the opportunity to appear." The Juvenile Court denied the request. After a hearing, the Juvenile Court granted the Children Division's petition for TPR. This appeal follows.

### Discussion

#### Point I

■ In their first point on appeal, Parents argue that the Juvenile Court erred in failing to appoint counsel from the outset of the case. We disagree.

■ We review the judgment terminating parental rights for whether the termination was supported by clear, cogent, and convincing evidence. *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004). Nevertheless, "[a] parent's right to raise his or her children is a fundamental liberty right protected by the constitutional guarantees of due process." *In re C.F.*, 340 S.W.3d 296, 298 (Mo.App. E.D.2011). Because a court's termination of the parent-child relationship has been characterized as "tantamount to a 'civil death penalty,'" we review it closely. *In re K.A.W.*, 133 S.W.3d at 12 (citation omitted). TPR statutes should be strictly construed in favor of the parent and preservation of the natural parent-child relationship. *Id.*

We are sympathetic to Parents' arguments that if they had counsel from the start of the case, that their advocate would have better explained to them the importance of strict compliance with their service plan, and thus they would have had a better chance of regaining custody of their

children. Nevertheless, the law in this area is well established.

The law provides for appointment of counsel when a qualified parent requests one. Section 211.211.4, RSMo. (2000) (court shall appoint counsel for custodian if it finds that custodian is indigent, desires appointment of counsel, and a full and fair hearing requires appointment of counsel); Section 211.462.2, RSMo. (2000) (parent shall be notified of right to have counsel, and trial court shall appoint counsel if parent requests counsel and is financially unable to hire counsel on own); *In re C.F.*, 340 S.W.3d at 300 (finding reversible error when father requested but was not provided counsel for preliminary proceedings prior to TPR hearing). If, however, a parent does not request counsel after receiving notice of his or her right to counsel, then the court is not obligated to appoint counsel. *See In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 809–10 (Mo. banc 2011); *In re L.E.C.*, 182 S.W.3d 680, 684–85 (Mo.App. W.D.2006) (finding no error in trial court's failure to appoint father counsel before he requested counsel); *see also In re J.D.* 34 S.W.3d 432, 434 (Mo.App. W.D.2000) ("the right to counsel [in termination proceedings] is not absolute"). Likewise, when a parent specifically waives his or her right to counsel in a TPR proceeding, the trial court does not commit reversible error in failing to appoint counsel anyway.

Several Missouri courts have taken the trial court's obligation a step further, and required that the trial court either appoint counsel for a parent or secure an affirmative waiver of counsel. *See e.g., In re J.S.W.*, 295 S.W.3d 877, 881 (Mo.App. E.D. 2009); *In re B.L.E.*, 723 S.W.2d 917, 920 (Mo.App. W.D.1987). In compliance with the stricter standard, the Juvenile Court here affirmatively secured a waiver of counsel from parents.

Parents claim on appeal that this waiver was not knowing and voluntary because they were not alerted to "the fact that, by waiving their right to counsel and entering into a jurisdictional consent agreement they were opening the door to a path, that if they were unable to satisfactorily complete the work, could lead to the termination of their parental rights." The assertion is not supported by the record; rather, the Juvenile Court specifically warned Parents that if they did not comply with the terms of the service agreement, they could lose their rights to the children.

Despite our sympathy with Parents, they affirmatively waived their right to counsel in December 2008, in March 2009, and in June 2009. In the face of these waivers, current Missouri law provides that the Juvenile Court did not err in not appointing counsel until Parents requested it in October 2009. *In re L.E.C.*, 182 S.W.3d at 684–85.

Point denied.

### Point II

■ In their second point on appeal, Parents argue that the Juvenile Court abused its discretion in denying Father's motion for continuance at the start of the TPR hearing. We agree.

■ The termination of parental rights is an exercise of awesome power that we do not review lightly. *In re R.M.K.*, 330 S.W.3d 602, 604 (Mo.App. E.D.2011). We balance our respect for the magnitude of this type of proceeding with the standard of review of a motion for continuance, which is for abuse of discretion. *Id.* The denial of a request for a continuance is rarely reversible error; however, the trial court does not have absolute discretion. *In re P.D.*, 144 S.W.3d 907, 911 (Mo.App. E.D.2004). We will find an abuse of discretion occurred when the court enters an order that is clearly against the logic of the circumstances and is so arbitrary or unreasonable as to shock the sense of justice. *Id.*

Under the circumstance here, and considering the severe consequences of this type of court procedure, we find that it was an abuse of discretion for the Juvenile Court to deny Father's motion for continuance. Parents had attended all but one of the scheduled court hearings, including the hearing immediately prior to the TPR hearing. Here, unlike in *In re R.M.K.* where Father had not appeared for three hearings prior to the TPR hearing, 330 S.W.3d at 604, Parents were fully participating in the termination process. *See H.W.S. v. C.T.*, 827 S.W.2d 237, 242 (Mo. App. E.D.1992) (recognizing that presence of parent whose rights are sought to be terminated is "extremely important" to that proceeding). Further, Parents were not abusing the judicial process by requesting multiple continuances. *Cf. State v. Wright*, 650 S.W.2d 714, 715–16 (Mo. App. E.D.1983) (consider court's grant of five earlier continuances and that criminal defendant was "no novice" to judicial process, in determining that court did not abuse its discretion in denying fourth continuance).

In addition, although Parents' appeal does not directly challenge the termination of their parental rights, we consider all of the circumstances to determine whether the Juvenile Court abused its discretion in failing to grant a continuance to allow Parents to participate in the TPR hearing. *See In re I.B.*, 48 S.W.3d 91, 98–99 (Mo. App. W.D.2001) (reviewing court can consider circumstances when determining whether juvenile court abused its discretion). Here, the Juvenile Court's jurisdiction stemmed from the discovery of unsafe and unsanitary conditions in the family home. The Children's Division agreed that while Parents remained in their house they kept it clean, and the evidence showed that children and Parents still maintained a strong family bond despite the separation. Further, the record showed no evidence that Parents physically abused the children, had problems with alcohol or drug use, or engaged in criminal activity. Rather, the Juvenile Court ordered the termination of parental rights after finding, inter alia, that Parent "continuously failed to demonstrate that they are capable and willing to appropriately care for the children's needs" in that they had "failed to complete nearly every service offered to them."

While a parent's failure to comply with his or her agreement with the Children's Division can support a termination of parental rights, such failure is only sufficient if it establishes one of the mandated grounds for termination under Section 211.447.4(3), RSMo. (2007).[1] In other words, a parent's failure to comply with the service plan does not alone constitute grounds for TPR, but is merely a factor to consider. *In re C.N.G.*, 109 S.W.3d 702, 707 (Mo.App. W.D.2003). Again, we will "strictly construe[ ] [the TPR statutes] in favor of the parent and preservation of natural parent-child relationship." *In re K.A.W.*, 133 S.W.3d at 12. We do not doubt that Parents did not fully, or perhaps even substantially, comply with their service agreements; however, the proper issue is whether they made progress towards complying with the service agreements. *In re C.N.G.*, 109 S.W.3d at 707. Close review of the record certainly demonstrates progress: Parents had resolved the unsanitary and unsafe conditions in their home while they remained there, at-

1. Section 211.447.4(3) provides that parental rights may be terminated when the child has been under the jurisdiction of the juvenile court for a period of one year, and the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, and there is little likelihood that those conditions will be remedied in near future.

tended three parenting classes, participated in psychological evaluations, attended some counseling, and obtained employment. Mother was able to maintain employment, she continued periodically with counseling, and she asserted that she continued taking psychotropic medication prescribed through her family doctor. In addition, Parents were granted unsupervised visitation until a second eviction occurred. It appears that many of Parents' failures in complying with their service agreements stemmed from their poverty: they paid no child support, they were unable to maintain housing, and Father could not maintain employment.

It is not clear from the record that the Juvenile Court did not terminate Parents' rights based solely on their failure to comply fully with the service agreement, rather than for a continuation of the conditions that led to the assumption of jurisdiction or for the existence of potentially harmful conditions for the children. Section 211.447.4(3); *In re C.N.G.*, 109 S.W.3d at 707. These confused grounds for the termination, combined with the Juvenile Court's failure to grant a continuance to allow Parents, who had regularly appeared for court hearings, to be heard, lead us to conclude that the Juvenile Court's failure to grant the requested continuance was an abuse of discretion. *In re P.D.*, 144 S.W.3d at 911.

Point granted.

### Conclusion

The judgment is reversed and remanded for further proceedings in accordance with this opinion.

CLIFFORD H. AHRENS, P.J., and ROY L. RICHTER, J., concur.